## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**EVE PATTEN-GENTRY**, a/k/a
**EVE PATTEN**,

                Plaintiff,

                                        No. 12-CV-15564

  vs.                                   Hon. Gerald E. Rosen

**OAKWOOD HEALTHCARE INC.**,
and **SUSAN YOUNGS**,

                Defendants.

_____/

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiff Eve Patten-Gentry was, until 2011, employed as an office assistant in one of Defendant Oakwood Healthcare, Inc.'s patient care facilities, operating under the supervision of Defendant Dr. Susan Youngs. Plaintiff, who has been diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder, was terminated from her position in 2011, allegedly for unsatisfactory work performance. Plaintiff brought this action on December 19, 2012, alleging that Defendants violated her rights under the Americans with Disabilities Act ("ADA") and the Family Medical Leave Act ("FMLA") by terminating her based on her

1

disability, failing to accommodate for her disability, interfering with her attempts to avail herself of her FMLA rights, and retaliating against her for exercising her FMLA rights.

Currently before the Court is Defendants' Motion for Summary Judgment (Dkt. # 15).  Having reviewed and considered the parties' briefs and supporting documents and the entire record of this matter, the Court has determined that the pertinent allegations and legal arguments are sufficiently addressed in these materials and that oral argument would not assist in the resolution of this motion. Accordingly, the Court will decide the motion "on the briefs." *See* L.R. 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Plaintiff Eve Patten-Gentry is a former employee of Defendant Oakwood Healthcare, Inc. ("Oakwood"), a hospital system located in Wayne County, Michigan.  Dep. of Eve Patten-Gentry, Dkt. # 15-2, at 27-28.  Defendant Dr. Susan Youngs, a medical doctor and Director for the Center for Exceptional Families at Oakwood, was in part responsible for the supervision of Plaintiff during her employment there.  Dep. of Susan Youngs, Dkt. # 15-3, at 9-10.

Plaintiff was hired by Oakwood as a "Lead Business Office Assistant" in September 1998.  Dep. of Eve Patten-Gentry, at 21, 25-26.  From 2000 until her

termination in 2011, Plaintiff served as a Lead Business Office Assistant in the Center for Exceptional Families (the "Center"), an outpatient treatment facility for children with learning disorders, autism, and other disabilities. *Id.* at 25-28. Plaintiff's job responsibilities at the Center broadly consisted of administrative and clerical tasks involved in the day-to-day operations of the Center, including scheduling of patient appointments, registration of patients, collecting and inputting demographic information related to patients, phone communications with patients and their families, preparing staffing schedules, handling cash collections and billing, some general maintenance and cleaning tasks, and handling other clerical and administrative duties. *Id.* at 39-40; *see also* Lead Business Office Assistant Job Summary, Dkt. # 15-4. Plaintiff's official job description included several minimum qualifications (such as a high school diploma and typing abilities) as well as several "mental requirements," including the ability "to constantly be able to concentrate on details with moderate amounts of interruptions"; "to attend to task/functions constantly for periods up to 60 minutes in length and frequently attend to task/functions constantly for periods exceeding 60 minutes in length such as complicated reports"; and "to constantly remember task/assignments given to self and others over both short and long periods of time." Lead Business Office Assistant Job Summary. As Plaintiff described her job, it required her to have strong communication skills and be able to multitask,

3

prioritize goals, be self-motivated, concentrate, and handle stressful situations. Dep. of Eve Patten-Gentry, at 40-43. Plaintiff reported to several individuals during her time at the Center, including Dr. Youngs; Trish O'Hare, the Office Manager at the Center; and Tammy Morris, Ms. O'Hare's successor as Office Manager. *Id.* at 26-28.

For most of her life, and for the entire duration of her employment with Oakwood, Plaintiff has suffered from Major Depressive Disorder and Generalized Anxiety Disorder. Dep. of Eve Patten-Gentry, at 31-32.[1] As Plaintiff describes her disability, it is manifested through difficulty in sleeping, uncontrollable crying, getting "stressed very easily," and an inability to "take care of [herself]," among other things. *Id.* at 33. In her deposition, Defendants' counsel questioned Plaintiff regarding the extent to which her disability limited her ability to perform certain tasks that were part of her job. Defendants' counsel asked Plaintiff whether her disability affected her ability to

- "schedul[e] . . . patient appointments." *Id.* at 44.
- "handle . . . registration duties." *Id.*
- "handle . . . billing function duties." *Id.*
- "handle . . . cash collections." *Id.*
- "handle phone communications." *Id.* at 44-45.
- complete "office maintenance duties." *Id.* at 45.

---

[1] Plaintiff was diagnosed with both disorders as an adult. Dep. of Eve Patten-Gentry, at 32.

4

In response to each of these questions, Plaintiff answered that her disability did not affect her ability to complete each task. *Id.* at 44-45. Defendants' counsel also questioned Plaintiff regarding the extent to which her disability limited the skills that were important in order for Plaintiff to do her job. Defendants' counsel asked plaintiff whether her disability affected her

- "communication skills." *Id.* at 45.
- "ability to multitask." *Id.* at 46.
- "ability to prioritize." *Id.*
- "ability to be self-motivated." *Id.* at 47.
- "ability to handle stressful situations." *Id.*
- "leadership skills." *Id.* at 48.
- "ability to promote efficient operations processes and performance-improvement processes." *Id.* at 48-49.
- "ability to concentrate on details with moderate amounts of interruption." *Id.* at 49.
- "attention span and ability to attend to tasks or functions for periods up to 60 minutes." *Id.* at 50.
- "ability to conceptualize." *Id.* at 50-51.
- "ability to remember tasks and assignments." *Id.* at 51.

Plaintiff responded that her disability sometimes affected each of these skills. *See id.* at 45-51.

The parties dispute the extent to which Plaintiff asked Defendants to make accommodations to allow Plaintiff to do her job despite any difficulties raised by her disability, and they also dispute the extent to which Defendants provided such accommodations. In her deposition, Plaintiff stated that she never asked Defendants to provide any specific accommodations to help her with any of the

5

skills that were sometimes affected by her disability as described above, *id.* at 45-51, with the exception of her ability to remember tasks and assignments, for which she "made [her] own accommodations" by writing Post-it notes. *Id.* at 51.[2] She further noted that she was not aware of any accommodations that Defendants could have provided to alleviate each of these problems. *Id.* at 46-50. Plaintiff does, however, broadly state in an unsworn declaration made pursuant to 28 U.S.C. § 1746 that she "consistently asked for help and it was refused." Unsworn Decl. of Pl., Dkt. # 17-4, ¶ 6. Further, Plaintiff asserts that she "requested the assistance of a part-time medical records clerk," and the request was denied. *Id.* ¶ 9.[3]

---

[2] Plaintiff also noted that she "didn't know that [she] had [the] option" to request accommodations to aid her in skills that were limited by her disability. Dep. of Eve-Patten Gentry, at 45, 51.

[3] Plaintiff further noted that her job was made more stressful because she repeatedly had to take on the work of Thomas Fitzgerald, a cognitively impaired employee at the Center. *See* Unsworn Decl. of Pl., ¶ 10; Dep. of Eve Patten-Gentry, at 98. In her brief, Plaintiff cites, as one piece of support for this proposition, the intake questionnaire that Plaintiff completed as a part of filing her Charge of Discrimination to the U.S. Equal Employment Opportunity Commission. Plaintiff fails to recognize that this document is not based on the personal knowledge of Plaintiff, nor does Plaintiff state in the document that she is able to testify to all of the assertions in the document. Indeed, page five of the document contains the statement that "[t]here are witnesses to the incidents and to facts noted above that will support my points noted above. The most relevant are those identified above and me. I will submit further information if the EEOC requests it." EEOC Intake Questionnaire, Dkt. # 17-2, ¶ 13. Essentially, the statements in the document are made based on knowledge, information, and belief, not personal knowledge. But because summary judgment is a provision intended to obviate trial, the facts forming the basis for summary judgment must be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(4). Accordingly, the Court does not consider assertions made in Plaintiff's EEOC intake questionnaire. The Court

6

Defendants note that "in response to [Plaintiff's] complaints that she felt her job required more than one person to do it . . . [t]here were many efforts to recruit the help of volunteers to off-load some of the work," and "Oakwood [brought] in a consultant to do a job assessment of the work," and that consultant came to the conclusion "[t]hat the position was doable with one full-time equivalent business office assistant."  Dep. of Tammy Morris, Dkt. # 15-5, at 62-63.  Plaintiff admits that a consultant was brought in and volunteers were sometimes used to help her, but she asserts that the consultant was only brought in "to uphold the status quo" and that the volunteers "made so many mistakes with the filing" that they were "counterproductive" and "Dr. Youngs stopped having [them] assist with filing." Unsworn Decl. of Pl., ¶¶ 8, 13.

The parties agree, however, that Defendants made some minor accommodations for Plaintiff related to her disability, including making a calendar for Plaintiff that itemized her job duties, Dep. of Eve Patten-Gentry, at 52-53, making lists for Plaintiff to help her keep track of her tasks, *id.* at 53-54, holding meetings and summarizing those meetings in writing as a reminder to Plaintiff, *id.* at 52-57; *see also* Meeting Summaries, Dkt. # 15-6, and referring her to an "Employee Assistance Program" and to Human Resources to discuss ways that Plaintiff could deal with her depression, *id.* at 57-58.

---

does consider, however, facts that are supported by Plaintiff's deposition, declaration, or other admissible evidence, as required by Rule 56.

During the course of her employment, Plaintiff was disciplined several times for work-related problems. First, in October 2008, Plaintiff received a "verbal counseling" for an incident that occurred on September 9, 2008. The events were documented in a Corrective Action Form written by Trish O'Hare and signed by O'Hare and Plaintiff:

> Dr. Youngs called Eve Patten, Marcy Sally, Mireya Martinez, and [Trish O'Hare] into her office mid-morning and expressed a feeling of "disconnect" with the patient flow. A patient had left after waiting longer than usual and a new patient was not put into the room in a timely manner. Dr. Youngs stated that we needed to communicate better and that Eve needed to tell someone a patient was here other than Dr. Youngs. Eve stated she was very busy up front and didn't realize the other staff did not know. Marcy and myself stated we were distracted with other business and did not realize someone was waiting. Upon Dr. Youngs and Marcy leaving the room Eve stated, "the chart in the door was not good enough?" (Referring to the process that is in place to alert staff of the next patient). I asked her why she did not bring that up. She stated, "Why would I? It would be a fight." She then stated that Dr. Youngs was pointing out all the things she had done wrong. Her voice became louder, she began to cry, and stated "F--- you guys. I'm doing the best I can!" She left the room crying. Mireya Martinez was still in the room at the time of the outburst. I shared the above information with Dr. Youngs later that day. Dr. Youngs spoke with Cindi Wells about the incident the following morning. I then met with Cindi to discuss next steps.

October 8, 2015 Corrective Action Form, Dkt. # 15-7.[4] The report states that while this type of incident "could be a major work violation with unpaid suspension,"

---

[4] Plaintiff does not contest the report's description of the incident, but she does state in written declaration that "while I should not have used the inappropriate language I did, the meeting highlights part of my problems in terms of workload . . . . The meeting was conducted while I was working as hard as I could

8

management elected to "council [sic] [Plaintiff] and stress the potential ramifications of this type of behavior" because Plaintiff "ha[d] never demonstrated such behavior" in the past. *Id.*

Second, in May 2009, Plaintiff was given a written warning for failing to make "patient reminder" calls, leading to nine patient "no shows." October 8, 2015 Corrective Action Form, Dkt. # 15-9. As the documentation of that incident states, such calls were part of Plaintiff's regular responsibilities. *See id.* In the "employee comments" of that form, Plaintiff wrote, "I'm overwhelmed. I'm doing the best I can." *Id.*

Despite these problems, Plaintiff's annual performance reviews in 2008 and 2009 were generally positive. In 2008, Plaintiff received 77 out of 90 total points on her performance review, which, under the criteria given in the review, indicates that Plaintiff "[c]onsistently meets and often exceeds the established standards of performance." 2008 Performance Review, Dkt. # 15-11. Plaintiff's performance was not equal across all categories of her job. For example, the report states that "[Plaintiff] is excellent and handling families['] concerns on the spot. Her challenge comes with making sure they are kept informed of delays . . . [s]he has some growing to do when it comes to taking ownership with management and peers." *Id.* at 3. Further, the report states that Plaintiff "[f]requently felt

to keep up with my workload and Thomas'[s] duties." Unsworn Declaration of Pl., ¶ 10.

overwhelmed and unable to perform [her] job to the level requested.  Needed verbal counseling regarding one incident in which she became upset and used unprofessional language."  *Id.*  Other sections of the report, however, provide somewhat contradictory notes.  One section, for example, states that Plaintiff "increased her ability to handle stressful situations with families and makes more of an effort to problem solve."  *Id.* at 7.  Others note that Plaintiff was effective in handling billing and "very effective in assuring proper coding and encounter completion."  *Id.* at 5.  Plaintiff received an 81% score for the "quality" section of her report, which assesses Plaintiff's effectiveness in completing day-to-day tasks -- a score that indicates that her work "often exceed[ed]" the established standard of performance.  *Id.* at 1, 3.

Plaintiff's 2009 performance review tells largely the same story.  Plaintiff's overall score of 87.5 out of 100 points placed her in the category of "[c]onsistently meets and often exceeds the established standards of performance."  2009 Performance Review, Dkt. # 15-12, at 1-2.  Like the 2008 report, however, Plaintiff's 2009 report contains comments indicating some performance problems in particular areas.  For example, the report states that Plaintiff "truly cares about our patients and families in relationships," but "at times she does not promptly reply or call back and this causes some distress for families left waiting."  *Id.* at 2.  Other negative comments also relate to day-to-day clerical tasks, such as

10

"[Plaintiff] does not always prepare medical records or place in the charts"; Plaintiff "struggle[s] with responsibilities including registering patient[s] with accurate information, referrals, entering . . . all required information"; Plaintiff "needs to continue to work on 'owning' issues related to visitors in the business office . . . [and] assist[ing] Dr. Youngs"; and "there have been many occasions of double and triple booking that contradict [Dr. Youngs's] instructions for scheduling." *Id.* Like her 2008 report, however, Plaintiff received an 80% score for the "quality" section of her 2009 report, indicating that her completion of day-to-day tasks "often exceed[ed]" the established standard of performance. *Id.* at 1-2. After both her 2008 and 2009 reviews, Plaintiff "received the highest raises that [she] was eligible to receive." Unsworn Decl. of Pl., ¶ 3.

The events directly leading to Plaintiff's eventual termination, and ultimately leading to this litigation, occurred in early 2011. First, in January 2011, Plaintiff was instructed to call the parent of an Oakwood patient to schedule an appointment. Plaintiff "initially refused" to make the call because the parent had left her a long voicemail message, which "irritated" her. Dep. of Eve Patten-Gentry, at 90-91. Plaintiff then made the call after being instructed to do so. *Id.* Second, around that same time, Plaintiff had suspected that another employee

11

(Thomas Fitzgerald) had been masturbating in one of the rooms at the Center.[5]
After Plaintiff notified Tammy Morris, Morris instructed Plaintiff that she would
handle the situation and that Plaintiff should not talk to anyone else about it. *Id.* at
94. However, Plaintiff, when having a discussion regarding the January 2011
missed call, "raised her voice" "in front of many staff and clinic witnesses" and
stated that "[it] is inappropriate [that] Thomas [is] masturbating in the filing room."
*Id.* As a result of these two events, Plaintiff was suspended from work for three
days. January 2011 Corrective Action Form, Dkt. # 15-13. The Corrective Action
Form categorized the violation as "insubordination," a major work violation under
Oakwood's policy. *Id.*[6]

Following her suspension, Plaintiff experienced what she believed to be a
"nervous breakdown" and sought medical treatment from Dr. Young J. Kwon,
M.D., at the Apex Behavioral Health Clinic in Brownstown, Michigan. Letter
from Dr. Kwon, Dkt # 17-22. Dr. Kwon found that Plaintiff had experienced an
"acute decompensation of her psychiatric problem" and recommended that she
take a four-week medical leave from her job. *Id.* Dr. Kwon also noted that further

---

[5] Plaintiff stated that she "knocked on the door for Thomas to open the door,
and . . . heard a lot of shuffling and a zipper being pulled, and the first thing that
went through [her] head is, he was doing something -- he was inappropriate." Dep.
of Eve Patten-Gentry, at 89.

[6] Plaintiff noted in her deposition that at the time of the January 2011 incident, had
been going through some difficult personal issues, including discovering that her
daughter had been using drugs. Dep. of Eve Patten-Gentry, at 89.

one- to two-week absences may have been necessary if Plaintiff suffered repeated flare-ups of her condition, and such flare-ups would make her unable to perform some functions of her job.  FMLA Certification Sheet, Dkt. # 17-13, at 3.  Plaintiff subsequently applied for and received leave under the Family Medical Leave Act ("FMLA") from January 24, 2011, to February 24, 2011.  FMLA Designation Notice, Dkt. # 17-16.

Around the time of Plaintiff's return to work in late February of 2011, the Center hired a new nurse practitioner, who was transitioning from shadowing Dr. Youngs to seeing patients at the Center independently.  Dep. of Susan Youngs, Dkt. # 15-3, at 71.  Plaintiff handled the scheduling of patients for the new nurse practitioner.  *Id.*  As Dr. Youngs testified in her deposition, "I gave [Plaintiff] specific instructions that we were to be very selective about which patients [the nurse practitioner] would see on her own because I wanted to set [her] up to be successful and I wanted the experiences for the families . . . to be great."  *Id.* Accordingly, Dr. Youngs instructed Plaintiff not to schedule appointments for the nurse practitioner without Dr. Youngs's approval.  Dep. of Eve Patten-Gentry, at 110-13.  At some point during March 2011, Dr. Youngs was scheduled to go on vacation for one week.  *Id.*  The week prior to Dr. Youngs's vacation, Plaintiff received an email from Tammy Morris instructing Plaintiff to "pack in" patients the week Dr. Youngs would be on vacation.  *Id.* at 109-110.  Plaintiff then

scheduled patients during Dr. Youngs's vacation without seeking approval from Dr. Youngs.[7]  *Id.* at 111-13.

When Dr. Youngs discovered that the patients had been scheduled during her vacation, she "was frustrated with the fact that the schedule was yet again done wrong."  Dep. of Susan Youngs, Dkt. # 15-3, at 72.  On March 30, 2011, Dr. Youngs spoke with Plaintiff about the issue,[8] and she reported the issue the following day through a Corrective Action Form, describing the incident as "unacceptable job performance," and forwarded it to human resources, without indicating the level of discipline required.  March 31, 2011 Corrective Action Form, Dkt. # 15-7.  On March 30, following the conversation between Plaintiff and Dr. Youngs, Plaintiff "was upset and crying," presumably as a result of the conversation and the events leading to it, and sought out Tammy Morris.  Unsworn Decl. of Pl., ¶ 21.  Plaintiff told Morris that she "could not stay," that she "was struggling," that she "[could not] do this," and that she needed to go home.  *Id.*

_____

[7] In her deposition, Plaintiff explained that the reason she did not ask for final approval from Dr. Youngs before scheduling the appointments was that she "didn't question [Tammy Morris's] direction" and that she thought that Dr. Youngs and Morris may have previously had a conversation changing the scheduling arrangement such that Plaintiff should follow Morris's scheduling directive without obtaining final approval from Dr. Youngs.  Dep. of Eve Patten-Gentry, at 111-12.

[8] Plaintiff testified that Dr. Youngs yelled at her during this conversation, asking "Who made these appointments and why are they on here?"  Dep. of Eve Patten-Gentry, at 112-13.  Dr. Youngs did not directly contradict this in her testimony, stating that she was "probably very frustrated" and upset during the conversation. Dep. of Susan Youngs, at 74.

Plaintiff told Morris that she "needed a few days off" and that she would "be back on Monday." Dep. of Eve Patten-Gentry, at 117. Morris neither assented nor objected to Plaintiff leaving, but offered to give Plaintiff a ride home, which Plaintiff declined. Unsworn Decl. of Pl., ¶ 21. Plaintiff left work on Wednesday, March 30, and did not return until Monday, April 4.

After Dr. Youngs filed the Corrective Action Form, Morris contacted Heather Knop, a human resources employee at the center. Dep. of Heather Knop, Dkt. # 15-16, at 20. Morris gave Knop "the scenario of what happened with the scheduling of patients" and expressed "concern that it was a violation of a minor work rule." *Id.* The two "walked through . . . where [Plaintiff] was at in the progressive disciplinary process and determined that the next step would be termination," based on Plaintiff's prior disciplinary history. *Id.* In a meeting on April 4, 2011, Knop spoke with Plaintiff "to hear the side of the employee as well as the manager," and subsequently terminated her. *Id.* at 33. Plaintiff states that at that meeting, she told Knop that her "FMLA paper work from [her] doctor said that [she] would need to leave during flare-ups of [her] condition and that was why she left." Unsworn Decl. of Pl., ¶ 22. Knop stated in her deposition that Plaintiff was terminated because of her unacceptable job performance in conducting patient scheduling, not because she had left work without permission. *Id.* at 34. The Corrective Action Form terminating Plaintiff indicates that Plaintiff was terminated

15

for "unacceptable job performance," though it lists both the scheduling issues and Plaintiff's leaving work without permission under the section labeled "description of incident." March 31, 2011 Corrective Action Form, Dkt. # 15-7.[9]

Plaintiff subsequently challenged her termination via Oakwood's Problem Resolution Procedure on April 7, 2011. In the documentation relating to that challenge, Plaintiff explained the series of events leading to her termination and requested that she "would like to still be employed by Oakwood but not at the [Center]." Problem Resolution Form, Dkt # 15-19, at 7. Because Oakwood's internal transfer policies prohibited an employee from being transferred within 6 months of a written warning or within 24 months of a suspension, Plaintiff's request was denied. Human Resources Policy and Procedure, Dkt. # 15-20, at 2. Plaintiff apparently reached an alternative resolution with Oakwood in which she would be given "[c]ontinued unemployment benefits for the remainder of . . . 26 weeks . . . , [h]elp with maintaining [her] medical and dental benefits for 6 months starting June 1st 2011 . . . , [and] a letter of recommendation . . . from Tammy L. Morris." Alternative Resolution Documents, Dkt. # 15-21. However, Plaintiff apparently elected "not . . . to sign the formal settlement agreement." Letter from

_____

[9] The Corrective Action Form did not include "[u]nauthorized absence from work area" -- one of the possible incident types listed on the back of the form -- as applicable to the incident giving rise to Plaintiff's termination. Plaintiff also made clear in her Unsworn Declaration that Knop "did *not* say that [Plaintiff's] leaving was *not* part of the reason for [her] termination." Unsworn Declaration of Pl., ¶ 22

16

Millicent Dein to Eve Patten-Gentry, Dkt. # 15-22.  Regardless, Morris still wrote

a positive letter of recommendation for Plaintiff, noting that Plaintiff was

particularly strong in interactions with families and that she

> was single-handedly responsible for scheduling, billing, registration, and reception for most of her years with the practice.  [Plaintiff] was excellent at managing and completing required monthly statistics reports, and maintaining the banking and postage for the office, without ever a reminder to complete these tasks.  [Plaintiff] navigated through our software programs efficiently for registration and billing purposes.

Letter of Recommendation From Tammy Morris, Dkt. # 17-5.

Plaintiff brought suit in this Court on December 19, 2012.[10]  Pl.'s Compl.,

Dkt. # 1.  She alleges three counts relating to her termination.  First, she alleges

disability discrimination under the Americans with Disabilities Act of 1990 (the

"ADA"), 42 U.S.C. § 12111 *et seq.*, asserting that Defendants "discriminated

against [Plaintiff] in that Defendants terminated her employment because she had a

disability under the ADA"; that Defendants "refused to re-hire her because she had

a disability under the ADA"; and that Defendants "discriminated against Plaintiff

in the terms and conditions of her employment in that they refused to

---

[10] Plaintiff also, at some point, brought a charge of discrimination before the Equal Employment Opportunity Commission ("EEOC"), filing an intake questionnaire on January 4, 2012.  See EEOC Intake Questionnaire, Dkt. # 17-2.  The parties do not discuss Plaintiff's EEOC charge in detail, though the record does indicate that the EEOC, based on its investigation, was "unable to conclude that the information obtained establish[ed] violations of the statutes.  EEOC Dismissal and Notice of Rights, Dkt. # 15-23.

accommodate her limitations and . . . refused to engage in the interactive process to explore how those limitations could have been reasonably accommodated." Pl.'s Compl. ¶¶ 48-50. Second, she asserts identical discrimination claims under the Michigan Persons With Disabilities Civil Rights Act (the "PWDCRA"), M.C.L. § 37.1201 *et seq.* Pl.'s Compl. ¶¶ 53-58. Last, she alleges that Defendants violated the Family Medical Leave Act (the "FMLA"), 29 U.S.C. § 2601 *et seq.*, "by terminating her employment . . . and/or refusing to re-hire her both in significant part because she took FMLA leave[] and/or because she was expected to take additional FMLA leave[] on an intermittent basis or otherwise in the future." Pl.'s Compl. ¶ 62.

## III. DISCUSSION

### A.   Rule 56 Standard

Under Fed. R. Civ. P. 56, Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

18

of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In addition, where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  But, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

## B.     Plaintiff's Claims of Disability Discrimination under the ADA

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination under the ADA is a broad concept that encompasses a

19

variety of types of claim for relief, including "among other theories, disparate treatment, harassment, and failure to accommodate." *Wells v. Chrysler Grp. LLC*, 559 F. App'x 512, 515 (6th Cir. 2014). As such, the ADA's statutory definition of the term "discriminate" includes not only hiring, promotion, and firing decisions made on the basis of a disability, 42 U.S.C. § 12112(a), but also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity," *id.* § 12112(b)(5).

Here, Plaintiff asserts that Defendants discriminated against her in two distinct ways: (1) by refusing to reasonably accommodate her limitations, and (2) by terminating her employment and refusing to re-hire her because of her disability. The Court addresses each of Plaintiff's claims in turn.

### 1. Plaintiff Has Failed To Make Out a Legally Cognizable Claim of Failure To Accommodate Under The ADA

To make out a *prima facie* claim of failure to accommodate under the ADA, Plaintiff must establish that

> (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.

20

*Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011); *see also Denczak v. Ford Motor Co.*, 215 Fed. App'x 442, 444 (6th Cir. 2007); *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997); *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996); *Olivan v. Henry Ford Hosp.*, No. 11-CV-13950, 2013 WL 1314952, at *4 (E.D. Mich. Mar. 29, 2013).

Defendants appear to concede the first element -- that Plaintiff "is disabled" within the meaning of the ADA.  Though Defendants never make this statement explicitly, their briefs contain no argument that Plaintiff's disability does not qualify.  Accordingly, the Court assumes, for the purposes of this motion, that Plaintiff is disabled within the meaning of the ADA.  Though the Court does not purport to make a legal ruling on this issue, the Court notes that previous cases in this Circuit have found plaintiffs with Major Depressive Disorder or Generalized Anxiety Disorder to be disabled within the meaning of the ADA.  *See, e.g., Bracken v. DASCO Home Med. Equip., Inc.*, No. 1:12-CV-892, 2014 WL 4388261, at *11 (S.D. Ohio Sept. 5, 2014); *Beair v. Summit Polymers*, No. CIV.A. 5:11-420-KKC, 2013 WL 4099196, at *3 (E.D. Ky. Aug. 13, 2013) (finding Plaintiff's major depressive disorder qualifies under the ADA in part because it "actually limit[s] the Plaintiff's brain function"); *Damron v. Butler Cnty. Children's Servs.*, No. 1:08-CV-257, 2009 WL 5217086, at *12 (S.D. Ohio Dec. 30, 2009) ("For the purposes of this case, the Court assumes that PTSD, major

21

depressive disorder, and obsessive compulsive disorder, qualify as impairments under the ADA" (footnote omitted)).  *But see, e.g.*, *Thompson v. Chase Bankcard Servs., Inc.*, 737 F. Supp. 2d 860, 883 (S.D. Ohio 2010) (Finding major depressive disorder did not qualify).[11]

Likewise, the parties do not appear to dispute that the third element -- that Defendants "knew or had reason to know about [Plaintiff's] disability" -- is satisfied.  Indeed, the record clearly indicates that Defendants had numerous discussions with Plaintiff regarding her diagnoses and how those diagnoses affected her employment.  Further, Defendants granted Plaintiff FMLA leave based on her disability and explicitly discussed her disability in email correspondence.  There is no question that Defendants knew about Plaintiff's Major Depressive Disorder and Generalized Anxiety Disorder.

The parties do, however, spend a substantial amount of their briefs disputing the second element -- whether Plaintiff was "otherwise qualified for [her] position."  *See* Def.'s Mot. for Summ. J., at 14-16; Pl.'s Resp. to Def.'s Mot. for Summ. J., at 14-18.  To satisfy this element, Plaintiff must establish (1) that she

---

[11] The three-part test for determining whether a plaintiff is disabled within the meaning of the ADA, though not mentioned by the parties here, is well-established by Supreme Court precedent.  "First, the Court considers whether a condition is an impairment; second, it identifies the life activity that the plaintiff relies upon and determines whether it constitutes a major life activity; and third, the Court asks whether the impairment substantially limits the major life activity."  *Williams v. Stark County Bd. of County Comm'rs*, 7 F. App'x 441, 445 (6th Cir. 2001) (citing *Bragdon v. Abbott*, 524 U.S. 624, 630–31 (1998)).

22

satisfies the prerequisites for the position she held or the position she desired, "such as possessing the appropriate educational background, employment experience, [and] skills," and (2) that she can perform the essential functions of the position held or desired, with or without accommodation. *Burns v. Coca–Cola Enterprises*, 222 F.3d 247, 256 (6th Cir. 2000) (alteration in original). Essential functions are "fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1); *see also Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). "Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; [and] (iv) The consequences of not requiring the incumbent to perform the function." 29 C.F.R. § 1630.2(n)(3).

The issue is a close one in this case. Defendants rely primarily on two sets of facts in arguing that Plaintiff was not qualified for her position at the Center. First, they assert that "Plaintiff admits that, when feeling stressed or overwhelmed, she could not perform the essential duties of her position." Def.'s Mot. for Summ. J., at 15. In supporting this statement, Defendants rely entirely on Plaintiff's deposition, discussed *supra* at 4-6, in which Plaintiff admitted that her disability "sometimes" affected a number of skills that were important to her job

23

performance. This testimony is difficult to assess, however, in light of the fact that, immediately prior to answering those questions in her deposition, Plaintiff stated that her disability did not affect her ability to do many of the direct tasks that composed the essential functions of her job, such as scheduling patients, answering phones, and performing other administrative duties. *See supra* at 4-6. The Court cannot say, when viewing the record in light most favorable to Plaintiff, that Plaintiff admitted she "could not perform the essential duties of her position."

Defendants' second argument is that in addition to Plaintiff's admission regarding the effect of her disability on her job performance, the factual background itself indicates that Plaintiff's ability to do her job was affected by her disability, as evinced by the various disciplinary procedures that Plaintiff went through during her employment. While the Court recognizes that these events clearly call into question Plaintiff's effectiveness in performing the essential functions of her position, especially the scheduling of patients, they must be viewed in the greater context of Plaintiff's overall job performance, which was, according to substantial evidence, satisfactory as a whole. The only formal documentation of Plaintiff's ability to complete her job as a whole is the two yearly performance reviews that are in the record, and the ultimate conclusion of both of these reports was that Plaintiff "[c]onsistently meets and often exceeds the established standards of performance." *See* 2008 Performance Review; 2009

24

Performance Review.  While those reports contained some negative comments with regard to Plaintiff's ability to do clerical tasks, like scheduling, she still received consistently high scores even on the subcategories of the reports that were related to completion of those specific tasks.  Further, the letter of recommendation written by Tammy Morris after Plaintiff's termination made no indication as to performance issues that would render Plaintiff unqualified for any similar job.

Defendants rely on several cases from this Circuit, most notably *Olivan v. Henry Ford Hospital* and *Jakubowski v. Christ Hospital, Inc.*, two cases finding that disabled plaintiffs were not "otherwise qualified" for their positions.  But those cases both involved more severe occupational shortcomings than this one.  In *Olivan*, this Court found that a hearing-impaired nursing assistant was not "otherwise qualified" for her job after she was the subject of complaints from patients and co-workers at least eight times for failing to understand job assignments or requests from patients.  *Olivan*, 2013 WL 131492, at *2-3, 5. Further, the Court noted that the plaintiff's disability led to dangerous situations in which medical staff could not get the attention of the plaintiff.  *Id.* at *6.  Also unlike the instant case, there were no positive reports of the plaintiff's performance that balanced the specific issues raised by the plaintiff's disability.  *See id.* Likewise, *Jakubowski* involved a medical resident who had Asperger's Disorder. *Jakubowski*, 627 F.3d at 197.  From the start of his employment at the defendant

25

hospital, fellow employees recognized his weak communication and cognitive skills, which resulted in him "fail[ing] his inpatient rotation," "giv[ing] dangerous orders that would have harmed patients if not caught by other physicians," and writing an "unclear order for medication . . . that [could] have killed [a] patient." *Id.* at 198. Unlike this case, there was no discussion of satisfactory performance in any way. *See id.* Defendants present no case finding that a plaintiff was not "otherwise qualified" for her position in circumstances similar to those of the instant case, where the plaintiff's performance was in large part approved of by her supervisors but was lacking in specific instances, resulting in disciplinary actions.

In sum, the Court agrees with Defendants that Plaintiff sometimes struggled with the essential duties of her job, and recognizes that this is a close issue. However, when viewing the evidence in light most favorable to Plaintiff, the Court cannot say that no reasonable juror could find that Plaintiff was "otherwise qualified" for her job within the meaning of the ADA.

The Court thus turns to the final two elements of Plaintiff's failure to accommodate claim: whether Plaintiff requested an accommodation, and whether Defendants failed to provide the necessary accommodation. "Plaintiff bears the initial burden to propose an accommodation and show that it is objectively reasonable." *Murphy v. Henry Ford Health Sys.*, No. 11-12425, 2013 WL 791290, at *17 (E.D. Mich. Feb. 5, 2013). Here, the record is relatively clear. Plaintiff

26

patently admitted in her deposition that she never asked Defendants to provide any specific accommodations to help her with any of the skills that were sometimes affected by her disability.  Dep. of Eve Patten-Gentry, at 45-51.  She further noted that she was not even aware of any accommodations that Defendants could have provided to alleviate these problems.  *Id.* at 46-50.  Plaintiff provides the statement that she "consistently asked for help and it was refused," Unsworn Decl. of Pl., ¶ 6, but such broad, "conclusory allegations . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992).

Plaintiff does provide testimony regarding one specific accommodation that she requested -- she asserts that she "requested the assistance of a part-time medical records clerk" and the request was denied.  Unsworn Decl. of Pl., ¶ 9.  But the record makes clear that Defendants made at least two separate attempts to accommodate Plaintiff on this issue: they actually provided the assistance that Plaintiff requested in the form of volunteers, and they also hired a consultant to identify whether additional help was needed for Plaintiff's role.  Even when viewing the evidence in the light most favorable to Plaintiff, Defendants' attempts to accommodate Plaintiff appear to have been in good faith and reasonable.  *See Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) ("The duty to engage in the interactive process with a disabled employee is mandatory and 'requires

27

communication and good-faith exploration of possible accommodations.'" (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007)).

Finally, Plaintiff suggests in her deposition and brief that she requested accommodation in the form of additional FMLA leave, following her 4-week leave from late January to late February, as Dr. Kwon had specified that further absences may have been necessary. *See* Dep. of Eve Patten-Gentry, at 178-79; Pl.'s Resp. to Def.'s Mot. for Summ. J., at 15 ("The plausible accommodation that Plaintiff proposes is that Plaintiff should have received intermittent FMLA leave . . . ."). Plaintiff asserts that she requested such an accommodation when she met with Heather Knop on April 4, 2011, five days after she had walked off the job on Wednesday, March 30. Unsworn Decl. of Pl., ¶ 22; Pl.'s Resp. to Def.'s Mot. for Summ. J., at 15. The problem with this argument, however, is that Plaintiff never requested any such accommodation prior to all of the conduct that allegedly gave rise to her termination. When Plaintiff left work on March 30, she did not request to take FMLA leave; she simply went home. Defendants maintain that even if Plaintiff's conduct could be construed as a request to take temporary FMLA leave, it actually *granted* that leave and accommodated Plaintiff's request -- Defendants are adamant that Plaintiff was terminated based only on her allegedly poor work performance. While Plaintiff asserts that this is merely a pretextual reason for terminating her, as discussed extensively below, that is an argument about

28

*retaliation*, not failure to accommodate -- Plaintiff asserts that even though she was not prohibited from leaving work by her supervisor on March 30, she was terminated based on her leaving.  This pretext argument -- based on circumstantial evidence such as the timing of her termination in close proximity to her leaving work on March 30 -- cannot support her failure to accommodate claim, which "unavoidably 'involve[s] direct evidence (the failure to accommodate) of discrimination' because the employer necessarily relied on the worker's disability in making decisions." *Cash v. Siegel-Robert, Inc.*, 548 F. App'x 330, 334 (6th Cir. 2013) (quoting *Kleiber* 485 F.3d at 868–69).  Essentially, Plaintiff has attempted to incorporate her ADA discriminatory discharge claim within her failure to accommodate claim.  The ADA's legal framework does not allow for such embedding.

Accordingly, the Court will grant summary judgment in favor of Defendants with regard to Plaintiff's failure to accommodate claim.

### 2.     Plaintiff Has Made Out a Legally Cognizable Claim of Discriminatory Discharge Under the ADA

Plaintiff also argues that Defendants violated the ADA by terminating her employment and by refusing to rehire her because of her disability.  "Since the crux of these cases is often the thorny issue of the employer's motivation, an ADA plaintiff may prove his claim either through direct evidence, *e.g.*, an admission of discriminatory intent, or through indirect evidence that will then shift the burden of

29

production to the defendant to justify its actions." *Mobley v. Miami Valley Hosp.*, No. 14-3665, 2015 WL 795310, at *3 (6th Cir. Feb. 25, 2015).

Plaintiff first argues that she has direct evidence of Defendants' discriminatory intent, which, if true, would mean that in order to establish her claim Plaintiff would only need to show "(1) that she is disabled, and (2) she is 'otherwise qualified' for the position despite the disability (a) without accommodation, (b) with the elimination of an allegedly essential job requirement, or (c) with a proposed reasonable accommodation." *Lai Ming Chui v. Donahoe*, 580 F. App'x 430, 437 (6th Cir. 2014). "Direct evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor." *Bartlik v. United States Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1248 (6th Cir.1995)). When direct evidence is presented, "no inference is necessary to conclude that the employee has proven this form of discrimination." *Kleiber* 485 F.3d at 868. "Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). As common sense would dictate, however, such evidence is unusual. *Id.* ("[R]arely will there be direct evidence from the lips of the defendant proclaiming his or her . . . animus"

(omission in original) (quoting *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998)) (internal quotation marks omitted)).

Plaintiff asserts that she has presented direct evidence of Defendants' discriminatory intent in the form of comments allegedly made by one of Oakwood's human resources representatives. In Plaintiff's deposition, she asserted that during a post-termination meeting with Tammy Morris and a Human Resources employee, Tammy "told [her that she] would not be rehired because per [Senior Vice President of Human Resources] Paul Conway, he was afraid that [Plaintiff] would be a burden to another department." Dep. of Eve Patten-Gentry, at 126. Plaintiff stated that neither Morris nor anyone else told her what was meant by Conway's alleged statement, and Plaintiff stated that she "assumed it was because [she] had cried in one of meetings," and therefore that Conway was referring to her disability as a "burden." *Id.* at 126-27.

This allegation fails to qualify as direct evidence for two reasons. First, the statement may not even be admissible -- Plaintiff's assertion relies on her recounting of what Morris said about Conway's statements -- a clear hearsay statement. Plaintiff provides no evidence that either Morris or Conway testified in their depositions as to Conway's alleged "burden" statement, nor does Plaintiff argue than an exception to the hearsay rule would apply. But even assuming that Conway did state that Plaintiff would be a "burden" to another department and that

evidence of such a statement would be admissible at trial, there is no reason to think that such a statement was a reference to Plaintiff's disability.  "Direct evidence is composed of 'only the most blatant remarks, whose intent could be nothing other than to discriminate' on the basis of some impermissible factor." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).  Conway's alleged statement is most reasonably interpreted as referring to Plaintiff's various issues with insubordination and inconsistent job performance, entirely independent of her disability.  Other cases in this Circuit in which a plaintiff demonstrated direct evidence of disability discrimination contain clear evidence of a defendant's intent to discriminate, in stark contrast with the instant case.  *Compare Taylor v. Bd. of Educ. of Memphis City Sch.*, 240 F. App'x 717, 720 (6th Cir. 2007) (employer made statement that hiring decision was made "to maintain racial balance"); *Coffman v. Robert J. Young Co.*, 871 F. Supp. 2d 703, 714 (M.D. Tenn. 2012) (Plaintiff's termination letter directly stated that plaintiff was being terminated due to her disability); *Burress v. City of Franklin, Tenn.*, 809 F. Supp. 2d 795, 811 (M.D. Tenn. 2011) (same), *with Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 658 (6th Cir. 1999) (employer's reference to the plaintiff as "the mentally ill guy

on Prozac that's going to shoot the place up" did not constitute direct evidence of discrimination).[12]

In the absence of direct evidence of discrimination, Plaintiff's claim is governed by the familiar analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The first stage of that analysis requires the plaintiff to establish a *prima facie* case of discrimination. If she is able to do so, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the employer's conduct. *Id.* at 802. If the employer is able to do so, "the remaining question is whether that reason was simply a pretext designed to mask discrimination." *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007).

To make out a *prima facie* claim of discriminatory discharge under the ADA, Plaintiff must establish that

> (1) . . . she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

---

[12] Plaintiff also asserts that she has presented direct evidence of discrimination in the form of Knop's notation at the bottom of the Corrective Action form that Plaintiff's leaving work in the middle of the afternoon was unacceptable. While this evidence is considered below in assessing the issue of whether Plaintiff's termination was pretextual and truly motivated by her disability, it does not provide any *direct* evidence of discrimination -- inferential leaps are required.

*Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012); *see also Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004). If the Plaintiff makes out a prima facie case, "[t]he defendant must then offer a legitimate explanation for its action. If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual. Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times." *Monette*, 90 F.3d at 1186-87. "[T]he plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).

As discussed above, Plaintiff has satisfied the first, second, and fourth elements of the *prima facie* case. There is also no dispute that the third element is satisfied -- neither party contests the fact that Defendants terminated Plaintiff -- nor do the Defendants argue that the fifth element is not satisfied. Accordingly, Plaintiff has established a *prima facie* case of discriminatory discharge.

Likewise, the parties appear to agree that Defendants have successfully shifted the burden back to Plaintiff. Defendants have offered "a legitimate, nondiscriminatory reason for terminating Plaintiff's employment," in that, entirely separate from Plaintiff's leaving work on March 30, she had progressed through

the steps of Oakwood's Corrective Action Program such that termination was appropriate. *See Olivan*, 2013 WL 1314952, at *7. "Therefore, to withstand summary judgment, it is Plaintiff's burden to demonstrate that Defendants['] proffered reason is pretextual." *Id.*

To establish pretext, the plaintiff is required to show by a preponderance of the evidence either "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer*, 29 F.3d at 1084 (quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993) (internal quotation mark omitted)); *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) ("To carry her burden in opposing summary judgment, [a plaintiff] must produce sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her"). Stated otherwise, Plaintiff must show that a reasonable juror could find, by a preponderance of the evidence, that "discrimination . . . is a 'but-for' cause of the employer's adverse decision." *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

Regarding the first alternative element, a plaintiff's showing that the proffered reasons for the employment decision had no basis in fact "is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are *factually false*." *Manzer* 29 F.3d at

35

1084 (internal quotation marks omitted).  Here, Plaintiff does not dispute that she engaged in the conduct that led to each of her disciplinary actions.

Regarding the third alternative element, a plaintiff's showing that the proffered reasons were insufficient to motivate discharge "is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff."  *Id.*  Here, plaintiff does not present any evidence that other Oakwood employees were not disciplined or terminated for unsatisfactory unacceptable job performance, insubordination, or any other conduct for which Plaintiff was disciplined.  And Defendants do provide at least some evidence that other employees were so disciplined -- in her deposition, Heather Knop stated "yes" in response to the question "[h]ave you ever known anyone to be fired for scheduling errors?"  Dep. of Heather Knop, Dkt. # 17-6, at 34.  Knop further stated that it was not unusual for employees to be disciplined for not following the directives of a supervisor, and if the employee had a sufficient previous disciplinary record, "it could be a termination even if it's a minor work rule violation." *Id.* at 34-35.

Plaintiff does argue, however, that she "should [only] have been at [a written warning level of discipline] given her discipline in May 2009 and January 2011,"

and accordingly, her conduct was insufficient to motivate discharge under Oakwood's disciplinary policy.  Pl.'s Resp. to Def.'s Mot. for Summ. J., at 20. Plaintiff is incorrect, at least as the Court reads Oakwood's disciplinary policy. Plaintiff is correct that, under the policy, "[i]nfractions of a minor nature will result in corrective action which begins with Step 1, Counseling . . . .   Any corrective action for minor infractions that occurs less than two . . . years after a previous correction should progress to the next step."  Employee Work Rules, Dkt. # 15-8, at 3.   There are five total Steps, only the last of which results in possible termination, leading Plaintiff to argue that she should only have been at Step 3 (a second written warning) at the time of her termination (as a result of her May 2009 and January 2011 incidents, which were within the two-year window at the time of the incident leading to her termination).  *See id.*

Plaintiff fails to recognize, however, that when major infractions are involved, the procedures differ.  Under the policy, "[i]nfractions of a major nature will result in corrective action that may begin with Step 4, [which is] a 3 or 5 Day Suspension, or may result in immediate Termination, Step 5."  *Id.* at 5.  Thus, a major infraction causes the employee's disciplinary record to bypass Steps 1-3 and proceed directly to Step 4.  From there, a minor infraction may proceed to the next Step, which is termination (Step 5).  *Id.* at 3.  Applying these rules, Plaintiff's January 2011 insubordination, which is a major infraction, *id.* at 7, moved

37

Plaintiff's disciplinary record directly to Step 4. From there, Plaintiff's March 2011 minor violation properly resulted in termination (Step 5) under the policy.[13]

The Court does find, however, that even given Plaintiff's disciplinary record in January of 2011, which put her at Step 4 of Oakwood's disciplinary policy, Plaintiff has produced sufficient evidence to demonstrate that there are genuine issues of fact as to whether *any* disciplinary action, even the most minor, was appropriate based on the scheduling issues that led to Plaintiff's March 31, 2011, corrective action. Plaintiff vehemently asserts that her conduct, while in contrast with the orders she received from Dr. Youngs, was in line with the orders she received from Tammy Morris, her direct supervisor. Pl.'s Resp. to Def.'s Mot. for Summ. J., at 21; Dep. of Eve Patten-Gentry, at 110-13. Which set of orders was controlling, and whether the orders were made clear enough that Plaintiff could reasonably be expected to follow them, are questions of fact that will turn on the credibility of witnesses at trial, and cannot be determined based on the current record. And if it is the case that Plaintiff's conduct related to the March 31 corrective action was not sufficient to result in *any* disciplinary action, then Defendants had no sufficient basis with which to terminate her.

---

[13] Importantly, Plaintiff does not appear to argue that her disciplinary incidents in January 2011 did not constitute insubordination or should not have resulted in a suspension, nor has she presented any evidence that similar behavior from past employees of Oakwood did not result in similar disciplinary measures.

Similar reasoning leads the Court to conclude that Plaintiff has met her burden in demonstrating that the proffered reasons presented by Defendants did not *actually* motivate Plaintiff's discharge. As the Sixth Circuit has explained:

> The second [alternative element] . . . is of an entirely different ilk [from the other elements]. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Manzer*, 29 F.3d at 1084. Here, Plaintiff relies on several facts in attempting to show that Defendants' choice to terminate Plaintiff was not due to her work performance, but rather due to her disability. First, she asserts, as explained above, that the conduct directly leading to her termination was in line with the orders she received from Morris, who was her direct supervisor. Pl.'s Resp. to Def.'s Mot. for Summ. J., at 21. Second, she argues that "the scheduling of patients was a minor issue," that the patients "simply needed to be rescheduled," and that such conduct did not warrant termination, implying that other, unlawful reasons actually motivated the termination. *Id.* Third, she notes that "the timing of the termination suggests that it was related to Plaintiff's condition and/or her leave[]. She had just returned from an FMLA/[Short Term Disability] leave related to her condition."

39

*Id.*[14] And fourth, she notes that the Corrective Action Form resulting from the March 30, 2011 incident included the notation that "[Plaintiff] also left work in the middle of the afternoon on 3/30/11 and she would not be back until 4/4/11. This was unacceptable." *See* March 31, 2011 Corrective Action Form, Dkt. # 15-7.

The Court is sympathetic to Plaintiff's position, for several reasons. First, as discussed above, the seemingly contradictory orders from two different supervisors unquestionably put Plaintiff in a difficult situation, and this fact must have entered her employers' minds when they were deciding on the appropriate level of discipline. While Plaintiff could have double-checked with Dr. Youngs to ensure that she wanted the patients booked during her vacation or asked Morris to clarify whether Plaintiff was to ignore Dr. Youngs's directive, the fact that her *direct supervisor* allegedly instructed her to schedule the patients surely raises doubt as to the severity of the scheduling errors, if they were errors at all. That doubt in turn raises doubt as to whether the scheduling errors truly were the straw that broke the

---

[14] Plaintiff also asserts that "[w]hile actual scheduling errors has been made previously . . . no one (on information and belief) had been disciplined let alone terminated for any of them" and that "Employees . . . often took unscheduled time off for personal reasons . . . [and] [n]o one (on information and belief)" had been disciplined let alone terminated for doing so." Pl.'s Resp. to Def.'s Mot. for Summ. J., at 21. Plaintiff's brief itself makes clear the problem with these assertions -- Plaintiff does not have personal knowledge of them, and so the Court cannot consider them on a motion for summary judgment. The Court notes that they also stand in contrast to statements of Heather Knop, who does have direct knowledge of the discipline of employees at Oakwood. *See* Dep. of Heather Knop, Dkt. # 17-6, at 34.

camel's back regarding Plaintiff's employment, as Defendants assert.  In short, even if an employer is reasonable to expect an employee to confirm the correct course of action with her employers when given relatively ambiguous instructions, the fact that the instructions were ambiguous makes Plaintiff's error, if any, less egregious, and accordingly provides a juror greater reason to think that Plaintiff's termination would not have occurred but for her disability.

Second, the timing of Plaintiff's firing, especially when viewed along with the notations on the Corrective Action Form mentioning that Plaintiff had left work on March 30, 2011, provides additional evidence that a jury could find sufficient to evince pretext.  Defendants correctly assert that while temporal proximity to an employee's leave is, in some cases, not enough alone to demonstrate pretext where other evidence of pretext is lacking.  *See Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (finding, in the context of an FMLA retaliation claim, that "the fact of temporal proximity alone [is] not particularly compelling, because the plaintiff's retaliation case was otherwise weak," but also recognizing that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support [the] inference" of causation).  But here, Plaintiff provides compelling temporal proximity evidence along with other indicators of pretext.  As discussed above, the circumstances giving rise to Plaintiff's termination were so minor that they raise doubts about the motivations of the termination.  But even

41

more troublingly, the Corrective Action Form documenting the March 31 incident that led to Plaintiff's firing clearly indicated Plaintiff's leaving work on the 30th -- which can plausibly be taken as Plaintiff's exercise of protected FMLA leave -- as a reason for the disciplinary action. Defendants respond that the "incident type" written on the form was "unacceptable job performance," rather than "unauthorized absence from work area," an alternative form of violation, or "excessive absenteeism," another alternative form of violation. The Court does not find this persuasive; the form clearly indicates that Plaintiff's absence was "unacceptable," and the conclusion that her absence was at least in part responsible for her disciplinary action naturally follows. Further, testimony from the witnesses makes clear that there is at least a factual question as to how much Plaintiff's absence from work played a part in her termination. For example, in her deposition, Heather Knop, in response to the question of whether leaving work was "part of the basis for [Plaintiff's] termination," stated "It was included in her -- it was documented. She was terminated for job performance, but she also left the worksite, so we wanted to make sure that was noted in the termination." Dep. of Heather Knopp, Dkt. # 17-6, at 31. Such unclear testimony must be further developed at trial.

On the whole, while the evidence does not overwhelmingly demonstrate that Defendants' provided reasons for terminating Plaintiff were pretextual, Plaintiff's

burden is not demanding: she must merely demonstrate that a juror, by a preponderance of the evidence, could reasonably reject Defendants' asserted reasons for Plaintiff's termination.  Though this is a close case, the Court finds that Plaintiff has met that burden, and accordingly the Court will deny summary judgment with regard to Plaintiff's discriminatory discharge claim.[15]

## B.    Plaintiff's Claims Under the FMLA

Plaintiff further alleges that Defendants interfered with her protected FMLA rights and both terminated her and refused to re-hire her in retaliation for her availment of FMLA leave.  The FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA, 29 U.S.C. § 2615(a)(1), and "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA, *id.* § 2615(a)(2).  The Sixth Circuit

---

[15] The parties appear to agree that "Michigan's Persons with Disabilities Civil Rights Act substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002) (footnote omitted), *abrogated by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012); *see also Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 405 (Mich. Ct. App. 1999) ("This Court and the Michigan Supreme Court have noted that the federal Americans with Disabilities Act . . . and the PWDCRA share the same purpose and use similar definitions and analyses, and both courts have relied on the ADA in interpreting the PWDCRA."); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998) (same).  Accordingly, the Court finds that for the same reasons Plaintiff's ADA discriminatory discharge claim survives summary judgment, her PWDCRA claims of the same ilk survive as well.

43

recognizes the two theories as distinct claims for recovery. *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 482 (6th Cir. 2010).

To establish a claim of interference under the FMLA, Plaintiff must demonstrate that

> (1) [s]he was an eligible employee, (2) defendant was a covered employer, (3) [s]he was entitled to leave under the FMLA, (4) [s]he gave defendant notice of [her] intent to take leave, and (5) the defendant denied [her] FMLA benefits or interfered with FMLA rights to which [s]he was entitled.

*Harris*, 594 F.3d at 482.

Plaintiff claims that Defendants interfered with her FMLA rights by discharging her for availing herself of FMLA leave when she left work following the March 30, 2011 incident. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., at 22. Plaintiff is correct that "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007). In this way, Plaintiff's interference claim essentially merges with her retaliation claim -- both are based on the same allegedly unlawful conduct carried out for the same reasons.

Defendants challenge the fourth element of Plaintiff's FMLA interference claim -- they assert that "following her initial FMLA leave, [Plaintiff] never requested an additional leave." Def.'s Mot. for Summ. J., at 21. They assert that

44

"[u]nder the FMLA regulations, an employee must provide her employer with enough information about the reason for the leave to permit the employer to designate the leave as FMLA leave." *Id.* In contrast. Plaintiff maintains that her interactions with Morris on March 30 were sufficient to put Defendants on notice that Plaintiff was taking FMLA leave pursuant to Dr. Kwon's order that she may need further time off due to flare-ups in her condition.

"[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998). However, the FMLA's notice provisions do not require an employee to mention the FMLA by name or specifically request approval before taking leave. Where the need for FMLA leave is unforeseeable, "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). The content of such notice need not be specific. "An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request. Depending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job . . . and the anticipated duration of the absence." *Id.* § 825.303(b).

The Sixth Circuit has distilled these provisions and held that "the critical test for substantively-sufficient notice is whether the information that the employee

45

conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004); *see also Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999) ("[A]n employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an [FMLA-qualifying] event . . . has occurred.").  And crucially, where the employee provides notice to an employer but that notice does not make explicit that the FMLA applies, the burden shifts to the employer to determine whether the event is FMLA-qualifying.  "In any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee or the spokesperson to ascertain whether leave is potentially FMLA–qualifying."  29 C.F.R. § 825.301; *see also Righi v. SMC Corp. of Am.*, 632 F.3d 404, 409–10 (7th Cir. 2011) ("Once an employee invokes his FMLA rights by alerting his employer to his need for potentially qualifying leave, the regulations shift the burden to the employer to take certain affirmative steps to process the leave request . . . . [including] a duty to make further inquiry if additional information is needed."); *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999); *Hammon*, 165 F.3d at 450.

46

Applying these standards to the facts of this case, the Court finds that there remain genuine issues of material fact as to whether Plaintiff provided adequate notice. The record provides numerous examples of Plaintiff's behavior when experiencing emotional difficulties based on her condition, including the events leading up to her January 2011 suspension and her subsequent 4-week FMLA leave. The record also provides evidence that the behavior that Plaintiff was exhibiting leading up to her leaving work on March 30, 2011 was of a similar nature, and Morris observed that behavior directly. To be sure, Plaintiff's statements as she was leaving work (that she "could not stay," "was struggling," and "could not do this") were vague and did not explicitly reference her condition. But the Court finds that, given Morris's experience with Plaintiff and her condition, it is plausible that Plaintiff's statements were sufficient to put Morris on notice that Plaintiff may have been experiencing a flare-up of her condition, thereby shifting the burden to the employer to inquire further. This conclusion is supported by the fact that Morris allowed Plaintiff to leave the workplace and offered her a ride home -- this is not the sort of behavior one would expect from an employer that believes an employee is leaving work without a legitimate reason. And critically, Defendants were on notice that Plaintiff could require unforeseen FMLA leave based on Dr. Kwon's letter, which they were clearly aware of. At a minimum, there remain genuine issues of material fact on the issue, as Plaintiff and

47

Morris provide different accounts of the events that day, and further factual development at trial will be necessary to determine whether Plaintiff's notice was adequate. Accordingly, the Court will deny Defendants' motion for summary judgment with regard to Plaintiff's FMLA interference claim.

Last, Defendants challenge Plaintiff's FMLA retaliation claim. The elements necessary to establish a *prima facie* case for retaliation under the FMLA are slightly different than those for an FMLA interference claim -- Plaintiff must establish that "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

Defendants only challenge the fourth element -- whether there was a causal connection between the FMLA activity and Plaintiff's termination. To satisfy this element, Plaintiff "must produce sufficient evidence from which an inference could be drawn that her protected activity was a but—for cause of the alleged adverse action by her employer." *Woida v. Genesys Reg'l Med. Ctr.*, 4 F. Supp. 3d 880, 899 (E.D. Mich. Mar. 18, 2014) (citing *University of Texas Southwestern Medical Center v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2533 (2013)); *see also Taylor v.*

48

*Bd. of Educ. of Memphis Schools*, 240 Fed. App'x. 717, 720 (6th Cir. 2007); *Ozier v. RTM Enterprises of Georgia, Inc.*, 229 Fed. App'x. 371, 377 (6th Cir. 2007) ("Under federal law, in order to show a causal connection between the protected activity and the adverse action—the fourth element of the prima facie case—[a plaintiff] must produce sufficient evidence to support an inference that [the defendant] took the adverse employment action because [the plaintiff] had complained of discrimination."); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Defendants here assert that Plaintiff's only connection between her exercise of FMLA leave and her termination is the proximity between the two, which Defendants assert "does not necessarily infer discriminatory intent." Def.'s Mot. for Summ. J., at 24. Defendants fail to recognize, however, that "[t]he burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir.2008) (internal quotation marks omitted). And, "contrary to Defendants' assertion, the Sixth Circuit has repeatedly held that, in the FMLA context, close proximity in time between the protected activity and the adverse employment action may constitute sufficient evidence of a causal connection." *Woida*, 4 F. Supp. 3d at 899; *see also Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007); *Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) ("Temporal proximity can establish

49

a causal connection between the protected activity and the unlawful employment action in the retaliation context."); *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) ("[T]his Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."); *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 826 (6th Cir. 2002) (stating that, in the FMLA context, "[p]roximity in time can raise a prima facie case of retaliatory discharge"); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). Here, the temporal proximity is particularly strong, as Plaintiff was terminated only days after her arguable exercise of FMLA leave. And, as described above with regard to pretext under the ADA, Plaintiff also provides evidence that her termination was related to her exercise of leave based on the incident description on her Corrective Action Form. The Court finds that Plaintiff has provided adequate evidence of causation to survive summary judgment. *See Woida*, 4 F. Supp. 3d at 900 (finding that six days' separation between plaintiff's request of FMLA leave and termination was "sufficient to raise an inference of causal connection"). Accordingly, the Court finds that Plaintiff has made out a *prima facie* case of FMLA retaliation.

50

From Plaintiff's established *prima facie* case, the *McDonnell Douglas* burden shifting analysis applies just as described above regarding Plaintiff's ADA claims. *See, e.g.*, *Skrjanc*, 272 F.3d at 315; *Woida*, 4 F. Supp. 3d at 901-02. And, as discussed above, while Defendants have demonstrated a non-discriminatory reason for Plaintiff's termination, Plaintiff has adequately met her burden by sufficiently demonstrating pretext sufficient to survive summary judgment. Accordingly, the Court will deny Defendants' motion for summary judgment with regard to Plaintiff's FMLA retaliation claim.

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Dkt. # 15) is **GRANTED IN PART AND DENIED IN PART**.  With regard to Plaintiff's failure to accommodate claims, Defendants' motion is **GRANTED** and those claims are dismissed with prejudice.  With regard to Plaintiff's other claims, Defendants' motion is **DENIED**.

**IT IS SO ORDERED.**

s/Gerald E. Rosen
Chief Judge, United States District Court



Dated:  March 31, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 31, 20155, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135